FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA 97 DEC -4  PM 3: 13
NORTHEASTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

XYPLEX, INC.,                              ]
                                          ]
                                          ]
        Defendant/Appellant/Cross-        ]
        Appellee,                         ]    CV-96-N-1675-NE
                                          ]
        vs.                               ]
                                          ]
ANDERSON-SMITH &                          ]    ENTERED
ASSOCIATES, INC.,                         ]
                                          ]    DEC 8   1997
        Plaintiff/Appellee/Cross-         ]
        Appellant.                        ]

### Memorandum of Opinion

This is an appeal from the decision of the United States Bankruptcy Court for the

Northern District of Alabama in an adversary proceeding by which it granted partial

judgment in favor of the plaintiff and against the defendant and granted partial judgment

in favor of the defendant and against the plaintiff. Appellant Xyplex, Inc. ("Xyplex"),

defendant in the court below, asserts that the bankruptcy court erred when it held that two

payments to Xyplex by its debtor constituted preferential transfers, refusing to apply 11

U.S.C. § 547(c)(2), the "ordinary course of business" exception.[1] *Appellant's Designation*

*of the Record and Statement of Issues*, filed April 8, 1996. Cross-appellant Anderson-Smith

& Associates, Inc. ("ASA"), debtor-in-possession and plaintiff in the court below, asserts

that the bankruptcy court erred when it held that one of its payments to Xyplex did not

---

[1]The bankruptcy court held that three payments to Xyplex did not constitute preferential transfers,
payments on invoice number 1924, 1265 and 1663. *Anderson-Smith & Assoc., Inc. v. Xyplex, Inc.* (*In the Matter
of Anderson-Smith & Assoc., Inc.*), 188 B.R. 679, 684 (Bankr. N.D. Ala. 1995). On appeal, Xyplex, Inc. challenges
only payments on invoice numbers 1265 and 1663. *Brief of Appellant/Cross-Appellee* at 5.

constitute a preferential transfer, applying 11 U.S.C. § 547(c)(1), the "contemporaneous exchange" exception. *Appellee and Cross Appellant Designation of the Record on Appeal to Limit and Specify Particular Documents*, filed April 24, 1996.

Jurisdiction lies with this court pursuant to 28 U.S.C. § 158. The court has carefully examined the entire file and applicable provisions of law and, pursuant to Bankruptcy Rule 8012(3), specifically finds that "the facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument." Therefore, the court will decide the appeal on the basis of the record and briefs of counsel and without oral argument.

Accordingly, the judgment of the bankruptcy court will be affirmed.

## I.   **Statement of the Case.**[2]

ASA is an engineering corporation, specializing in design and installation of computer network systems, and Xyplex supplied ASA with network systems components on credit. The relationship between the parties began approximately one year before ASA petitioned the bankruptcy court for relief. On December 20, 1993, the parties executed a written agreement, the Xyplex Value-Added Reseller Agreement ("written agreement"), by which Xyplex, upon receipt of purchase orders, would supply goods to ASA. *Transcript of Hearing*, filed May 23, 1996, at 11, 49. Under the written agreement, ASA would remit payment to Xyplex for any shipments within thirty days of the date Xyplex issued an invoice to ASA. *Id.* at 11, 53.

---

[2]The facts set out below are gleaned from the bankruptcy court's findings of fact in its Memorandum Opinion, entered November 17, 1995. References to the record, which support the bankruptcy courts findings, are added by this court, after its own examination of the evidence.

2

Payment for the first order of goods from ASA became the subject of this appeal. ASA placed its first order for $36,034.00 in goods on the same day that the parties executed the written agreement, in anticipation of a government contract, which the parties expected ASA to procure in February 1994. *Id.* at 17, 38, 88. Despite their written agreement, Xyplex district manager, Tom Domzal ("Domzal"), advised ASA that it could place the order without paying the invoice until ASA had procured the government contract. *Id.* at 38-40. In December 1993, ASA placed the order, Xyplex delivered the goods, and Xyplex issued its invoice number 1265 to ASA for payment. *Id.* at 17, 19. When ASA did not procure the government contract in February 1994, Xyplex pressed ASA for payment. *Id.* at 89. However, ASA president, C.A. Anderson ("Anderson") testified that Domzal continued to instruct ASA to withhold payment until it could resell the goods. *Id.*

On June 24, 1994, ASA placed another order with Xyplex for $25,156.00 in goods needed for a different government contract. *Id.* at 22-23. Although invoice number 1265 remained unpaid, Xyplex shipped ASA's second order and issued invoice number 1663. *Id.* On August 17, 1994, ASA "responded to repeated past due notices from Xyplex" by informing Xyplex that it would not pay invoice number 1265 until it was able to resell the goods. *Id.* Upon selling a portion of the goods represented by invoices number 1265 and 1663, ASA remitted partial payment by check, numbered 6762 ("check #1"), dated September 14, 1994, in the amount of $19,211.00. *Id.* at 18. Check #1 cleared Xyplex's account on October 26, 1994. *Id.* Upon selling another portion of the goods represented by invoices number 1265 and 1663, ASA sent Xyplex another check, numbered 6937 ("check #2"), dated November 1, 1994, in the amount of $17,434.76. *Id.* ASA's bank

3

dishonored check #2 for insufficient funds. *Id.* Anderson testified that ASA's account had sufficient funds to cover check #2, but its bank returned the check because of a garnishment order placed on its account by another creditor. *Id.* at 19. Immediately upon learning of the dishonored check, ASA contacted Xyplex and sent a repayment check, numbered 230 (check #3), dated November 11, 1994, in the same amount. *Id.* at 31. Check #3 cleared Xyplex's account on November 16, 1994. *Id.* at 23. Also, during this time, ASA returned the remaining goods in its possession represented by invoice number 1265 to Xyplex, realizing that it would be unable to sell them. *Id.* at 20, 41.

Xyplex financial manager and Rule 30(b)(6) corporate representative, Kimberly Chi ("Chi"), testified that only five to ten percent of Xyplex distributors fail to pay its invoices on time. *Id.* at 63. According to Chi, an account overdue by more than ninety days is "unusual." *Id.* However, Xyplex ordinarily works with these customers, often allowing them to pay Xyplex when they get paid. *Id.* at 68, 78-79. Xyplex and ASA continued to do business, but in late 1994 Xyplex began to insist upon cash on delivery payments from ASA. *Id.* at 69.

Payment for a third order became the subject of the cross-appeal in this case. ASA placed this order on October 31, 1994, for $98,224.30 in goods. *Id.* at 24. On November 7, 1994, in light of ASA's financial insecurity and the large size of the order, ASA and Xyplex discussed the possibility of ASA assigning to Xyplex the proceeds from sale of the goods to ASA's customer, Southern Company. *Id.* at 25. Chi testified that Xyplex usually requires customers to personally guarantee their debt or provide an assignment of proceeds for unusually large orders such as this or where Xyplex is concerned with the viability of the

4

customer. *Id.* at 53. Anderson testified that he agreed to personally guarantee payment for the order. *Id.* at 25. On November 9, 1994, Xyplex delivered the order, and it issued invoice number 1888 to ASA for payment. *Id.* at 24.

On November 18, 1994, upon receiving payment for the goods, Anderson endorsed Southern Company's draft (check #4) over to Xyplex, in the amount of $135,297.34.[3] *Id.* at 26. Anderson testified that he made payment to Xyplex in this way because of the previous problem with ASA's check being dishonored due to a garnishment on its account and because of his personal guarantee on this order. *Id.* at 25-26. Anderson negotiated the Southern Company check to Xyplex with the understanding that Xyplex would remit the balance in excess of the $98,224.30 that ASA owed on invoice number 1888. *Id.* at 26. Instead, Xyplex remitted approximately $29,000 to ASA. *Id.* at 26, 54. According to Chi, Xyplex paid the difference of approximately $7,800 to the Alabama taxing authorities as sales tax. *Id.* at 47, 55.

On December 16, 1994, ASA voluntarily petitioned the bankruptcy court for relief under Chapter 11. On May 10, 1995, ASA initiated an adversarial proceeding to recover payments or transfers made to Xyplex during the 90 day preferential period, pursuant to 11 U.S.C. § 547, which began September 16, 1994. ASA claimed that it made the payments or transfers that formed the basis for this action while it was insolvent, in satisfaction of a debt existing before the preferential period began, and that those payments or transfers allowed Xyplex to receive more than it would otherwise receive in Chapter 7.

---

[3] According to Chi, this was the fastest that any customer had ever paid a Xyplex invoice. *Transcript of Hearing*, filed May 23, 1996, at 47, 54. But, Domzal testified that early payment by Xyplex customers was not unusual, that some Xyplex customers even paid in advance. *Id.* at 80-81.

On September 14, 1995, the Bankruptcy Court for the Northern District of Alabama, Judge Jack Caddell presiding, held a trial on the matter. Following the trial, the court ruled (1) with respect to payments made by check #1, on September 14, 1994, and check #3, on November 11, 1994, ASA is due to recover the total amount of $36,645.76 as an avoidable preference, and (2) with respect to the payment made by check #4, on November 18, 1994, Xyplex is due to retain $98,224.30 of the total amount.[4] ASA appeals and Xyplex cross-appeals to this court for relief from the ruling of the bankruptcy court that was adverse to each of them.

## II.    Standard of Review.

Findings of fact by the Bankruptcy Judge must be accepted by this court unless they are clearly erroneous, giving due regard to the opportunity of the court below to judge the credibility of the witnesses first hand. *Federal Landbank of Jackson v. Cornelison*, 901 F.2d 1073 (11th Cir. 1990). However, the deference due the bankruptcy court's factual findings is not applicable to its conclusions of law. On such conclusions, this court's review is *de novo. In re Sublett*, 895 F.2d 1381, 1383 (11th Cir. 1990). *See Bowest v. Stafford*, 123 B.R. 415, 21 Bankr. Ct. Dec. 503 (N.D. Ala. 1991).

## III.    Discussion.

Bankruptcy law aims to distribute the bankruptcy estate to those with claims against the estate in a prescribed order for different classes of creditors. *See* 11 U.S.C. § 726. This

---

[4] The bankruptcy court also ruled that (1) a payment made on January 20, 1995, over a month after ASA filed its bankruptcy petition, in the amount of $11,439.64, is not a voidable preference and is due to be retained by Xyplex, and (2) Xyplex is entitled to a setoff of $7,800.00, the amount "mistakenly" withheld and paid to the Alabama taxing authorities as sales tax on one order, which ASA may be able to recover directly from the state. *Order*, entered Nov. 11, 1995. Neither of these rulings is challenged on appeal.

goal is undermined by pre-bankruptcy transfers that unfairly deplete the estate.  To remedy this inequity, the Bankruptcy Code provides the trustee with the power of *avoidance*, the undoing and recovery of pre-bankruptcy transfers of the debtor's property.  The primary form of avoidance is by recapture of *preference* payments,[5] the "transfer of the debtor's property on the eve of bankruptcy, to satisfy an old debt."  Orelup, Elizabeth A., Note, *Avoidance of Preferential Transfers Under the Bankruptcy Reform Act of 1978*, 65 Iowa L. Rev. 209, 209 (1979).  The court will disallow and order repayment to the bankruptcy estate any pre-bankruptcy transfer that qualifies as a preference.

Section 547(b) defines preference as: (1) any transfer of an interest in the debtor's property; (2) to or for the benefit of a creditor; (3) for an antecedent debt; (4) made while the debtor is insolvent; (4) within ninety days before the filing of the petition;[6] (5) that enables the creditor to receive more than she would otherwise receive in a Chapter 7 distribution of the bankruptcy estate.  11 U.S.C. § 547(b).  Congress intended preferences to discourage creditors "from racing to the courthouse" to collect against a troubled debtor, which only increases the likelihood of the debtor's bankruptcy.  H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6138.

A transfer that qualifies as a preference under § 547(b) is nevertheless safe from avoidance by the trustee to the extent that the transfer fits within one of the exceptions

---

[5]Other forms of avoidance include: (1) the trustee as a hypothetical lien creditor; 11 U.S.C. § 544(a)(1) & (2); (2) the trustee as a bona fide purchaser; 11 U.S.C. § 544(a)(3); (3) the trustee as a successor to actual creditors; 11 U.S.C. § 544(b); *see also* 11 U.S.C. § 551; (4) statutory liens; 11 U.S.C. § 545 (5) reclamation; 11 U.S.C. § 546(c); (6) fraudulent transfers and fraudulent obligations; 11 U.S.C. § 548(a) & (b); (7) post-petition transfers; 11 U.S.C. § 549(a); and (8) setoff; 11 U.S.C. § 553(a) & (b).

[6]The preference period is one year before the filing of the petition for transfers to insiders.

described by § 547(c). The § 547(c) exceptions "are designed to rescue from attack those kinds of transactions, otherwise fitting the definition of a preference, that are essential to commercial reality and do not offend the purposes of preference law, or that benefit the ongoing business by helping to keep the potential bankrupt afloat." Orelup, 65 Iowa L. Rev. at 233. Whereas the trustee must prove that a certain transfer deserves treatment as a preference under § 547(b), the creditor bears the burden of proving that a § 547(c) exception applies. 11 U.S.C. § 547(g); *In re Websco, Inc.*, 92 B.R. 1, 2 (Bankr. D. Me. 1988); *Matter of Wellington Constr. Corp.*, 82 B.R. 424, 430 (Bankr. N.D. Miss. 1987).

In this case, the bankruptcy court held, and the parties do not dispute, that ASA met its burden of proving that the challenged transfers qualify as a preference pursuant to § 547(b). The issue before this court is whether Xyplex proved that the challenged payments fall under one of the § 547(c) exceptions, thereby escaping preference treatment.

### A.    **Appeal by Xyplex.**

Appellant Xyplex challenges the bankruptcy court decision that payments made to it by ASA on September 14, 1994 and on November 11, 1994, totaling $36,645.76, do not qualify as an exception and are due to be avoided by the debtor-in-possession.[7] *Brief of Appellant/Cross-Appellee* at 2, 8-11. Specifically, Xyplex contends on appeal that the payments qualify for the "ordinary course of business" exception of § 547(c)(2). *Id.*

---

[7] Although Xyplex, in its statement of issues, refers to "three (3) payments made by the debtor to Xyplex," it clarifes the discrepancy in its argument when it discusses the September 14, 1994, payment (check #1), the November 1, 1994 dishonored check (check #2) and the November 11, 1994, (check #3), as the three challenged transactions. *Brief of Appellant/Cross-Appellee* at 2, 8.

8

The ordinary course of business exception prevents avoidance of transfers during the preference period as follows:

to the extent that such transfer was—

(A)    in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B)    made in the ordinary course of business or financial affairs of the debtor and the transferee;  and

(C)    made according to ordinary business terms.  11 U.S.C. § 547(c)(2).

With this exception, Congress sought to exempt from preference those payments that are part of "normal financial [or business] relations."[8]  For example, this provision extends protection to payment by a consumer of a utility bill or a business debtor's timely payment for inventory that its creditor regularly supplies on revolving credit. This exception recognizes that avoiding payments that are a part of normal financial and business relations effectively discourages creditors from extending even short-term credit to their regular debtors when they become financially troubled.  Countryman, Vern, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand. L. Rev. 713, 775 (1985).  It recognizes that discouraging such creditors would just expedite the troubled debtor's demise.  *Id.*

According to the statute, a creditor seeking protection under this provision must prove that payments were *ordinary* in each of three different ways: (1) the debtor incurred

---

[8] *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 373, *reprinted in*, 1978 U.S. Code Cong. & Admin. News 5963, 6329; S. Rep. No. 989, 95th Cong., 2d Sess. 87, *reprinted in*, U.S. Code Cong. & Admin. News 5787, 5874. Congress recognized that such payments do "not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Id.*

the debt in the ordinary course of its business with the creditor; 11 U.S.C. § 547(c)(2)(A);

(2) the debtor paid the debt in the ordinary course of its business with the creditor; 11

U.S.C. § 547(c)(2)(B); and (3) the terms of the payment were according to ordinary business

terms; 11 U.S.C. § 547(c)(2)(C); *see Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d

1172 (10th Cir. 1989); *J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66 (3rd Cir. 1989);

*see also In re Cleveland Graphic Reproduction, Inc.*, 78 B.R. 819 (Bankr. N.D. Ohio 1987)

(ordinary course of business defense requires creditor to prove all three elements). In this

case, the bankruptcy court directly addressed the second element, and made findings of

fact related to the first and third elements. *Anderson-Smith & Assoc., Inc. v. Xyplex, Inc.*

*(In the Matter of Anderson-Smith & Assoc., Inc.)*, 188 B.R. 679 (Bankr. N.D. Ala. 1995).

As to the first element, the bankruptcy court stated, "It is certainly within the ordinary

course of business for an engineering corporation specializing in the manufacturing and

installation of computer and network systems to order supplies that enables [sic] it to

manufacture computer and network systems on credit." *Id.* at 685. However, according

to the findings of fact by the bankruptcy court, "the circumstances surrounding the initial

agreement concerning [this particular debt] wherein Debtor was pressured into taking

deliver [sic] of goods in anticipation of being awarded a government contract was not in

the ordinary course of business for either party." *Id.* at 687. Upon careful review of the

evidence, this court concludes that the bankruptcy court's factual determination that Xyplex

pressured ASA into taking delivery of the goods was not clearly erroneous. Furthermore,

the factual finding that such pressure sales are not in "the ordinary course of business for

either party" is not clearly erroneous.

10

On this point, Xyplex argues on appeal, "How could the first transaction between the parties have been outside their ordinary course of business when it was *the first transaction?*"  *Brief of Appellant/Cross-Appellee* at 9.  The bankruptcy court correctly stated the law in this regard: "courts have focused on the prior conduct of the parties, the common industry practice, and particularly, whether the payment resulted from any unusual action by either the debtor or the creditor."  *Anderson-Smith*, 188 B.R. at 685 (citing COLLIER ON BANKRUPTCY 547 (15th Ed. 1993)); *see also In re Food Catering & Housing, Inc.*, 971 F.2d 396 (9th Cir. 1992) (considering prevailing business standard); *Marino v. First Nat'l Bank (In re Garofalo's Finer Foods)*, 186 B.R. 414 (Bankr. N.D. Ill. 1995) (considering industry practices or standards).  The burden of proof is on Xyplex, and the shorter the history of dealings between ASA and Xyplex, the more Xyplex must rely upon the industry standard to meet its burden.  *See Fiber Lite Corp. v. Molded Acoustical Products (In re Molded Acoustical Products)*, 18 F.3d 217 (3rd Cir. 1994).  Although Xyplex offered no evidence of the common industry practice in this regard, the bankruptcy court heard testimony from Anderson and Domzal about the business practices at ASA and Xyplex before and during their relationship with each other.[9]  From this testimony, the bankruptcy

---

[9] Anderson, president of ASA, testified generally as to the type of projects in which his company became involved, and he testified that Xyplex was one supplier of products for these projects.  *Transcript of Hearing*, filed May 23, 1997, at 11-15.  Anderson continued, testifying that the order in question "represented equipment that Xyplex's regional manager requested we order and put in our inventory" and that "our understanding was that these were some items that were going to be needed quickly when the Army placed the order."  *Id.* at 17.

Domzal, Xyplex regional manager, testified that "in the event that we find an opportunity or know of an opportunity, you know, to get their people involved, we will go to them and try and attempt to close that business for them."  *Id.* at 76.

But, regarding the preliminary projections for business between ASA and Xyplex, Anderson testified, "I was feeling very nervous about committing to figures of the magnitude [Domzal] spoke of. But, he kept telling me that this huge army order was coming through in just days. At most, weeks. And, it would take care of the first six months of projections. It never happened."  *Id.* at 86.

court did not clearly err when it made the factual determination that "the unusual nature in which Debtor was urged to accept the first shipment was not in the parameters of the parties' ordinary course of business." *Anderson-Smith*, 188 B.R. at 685. Therefore, this court concludes that, as a matter of law, Xyplex failed to meet its burden of proving that ASA *incurred* the debt in question in the ordinary course of business.

As to the second requirement of the ordinary course of business exception, the bankruptcy court held that *payment* of the debt in question was not in the ordinary course of business between ASA and Xyplex. 11 U.S.C. § 547(c)(2)(B). In support of its finding, the bankruptcy court cites the following factors: (1) ASA endured "unusual debt collection efforts and pressure by Xyplex to make [ASA] pay;" (2) "ASA could not and would not pay for [this debt] until it was able to sell the goods;" and (3) ASA's check, issued on November 1, 1997, "bounced," requiring that ASA issue a replacement check. *Anderson-Smith*, 188 B.R. at 687. Upon careful review of the evidence, this court concludes that the bankruptcy court's foregoing factual determinations were not clearly erroneous.

Xyplex argues on appeal that its collection practices, the late payments made by ASA, and the replacement check proffered by ASA were all within the ordinary course of business between them. *Brief of Appellant/Cross-Appellee* at 8-11. Xyplex, in its argument, distinguishes the facts of cases upon which the bankruptcy court relied, and offers its own cases with practices and payments by the parties that are similar to those in the present case. *Id.* However, Xyplex's argument misses the larger concept: the ordinary course of business between two parties is a fact specific determination for each individual case. *See In re Fred Hawes Organization, Inc.*, 957 F.2d 239 (6th Cir. 1992), *reh'g denied* (1992), *reh'g*

12

*en banc denied* (1992) (section 547(c)(2)(B) requires that payment is ordinary in relation to other business dealings between the parties). The question is whether the practices and payments of the parties before the court conformed to the ordinary business practices of those particular parties' and of their particular industry. 11 U.S.C. § 547(c)(2)(B) ("ordinary course of business or financial affairs of the debtor and the transferee"); *see also In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr. W.D. Okla. 1986) (court must determine that which is subjectively ordinary as between debtor and creditor and that which is objectively ordinary according to common industry practice).

In this case, the bankruptcy court had ample evidence with which to determine the ordinary course of dealing between these particular parties, and its determination that the payments in question fell outside these particular parties customary practice is not clearly erroneous. Furthermore, Xyplex offered no evidence of the ordinary course of business dealings within the industry. Therefore, this court concludes, as a matter of law, that Xyplex failed to prove that ASA's *payment* of the debt in question was in the ordinary course of business between ASA and Xyplex.

As to the third element of the ordinary course of business exception, like with the first element, the bankruptcy court did not specifically state whether Xyplex proved that the payment in question was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(C). However, the bankruptcy court made factual findings, supported by the evidence, that this transaction varied from the ordinary business terms for such transactions. For example, the bankruptcy court determined that ordinary terms between these parties required payment of an invoice within thirty days of issuance. *Anderson-Smith*, 188 B.R. at

13

687. As to the invoices in question, ASA delayed payment by between four and ten months. *Id.* at 686. Upon careful review of the evidence, this court concludes that these factual determinations made by the bankruptcy court were not clearly erroneous.

Xyplex argues on appeal that ordinary business terms included "late payments." *Brief of Appellant/Cross-Appellee* at 9-10. Chi testified, "we (Xyplex) would like all dealers to pay within thirty days, however, frequently they do not pay within thirty days." *Transcript of Hearing*, filed May 23, 1996, at 50. But, Chi also testified that, even though the contract was not strictly enforced, such late payments by ASA were "substantially different from the terms of the contract" between Xyplex and ASA. *Id.* at 51-52.

"Ordinary business terms" refers to the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy, because such terms do not raise the dangers that § 547 preference payments seek to avoid. *Clark v. Balcor Real Estate Fin. (In re Meredith Hoffman Partners)*, 12 F.3d 1549 (10th Cir. 1993), *cert. denied*, 114 S. Ct. 2677 (1994). One court recently required that a defendant-supplier, in an adversarial proceeding, satisfy its burden of proof as to § 547(c)(2)(C) by presenting "detailed evidence" as to the similarity of supplier's customer base to debtor. *Gray v. Huntsman Chem. Corp. (In re Dooley Plastics Co.)*, 185 B.R. 389 (Bankr. D. Mass. 1995). Such evidence according to that court would include (1) the number of customers and the number of delinquent accounts, (2) amount of credit usually extended to account debtors, and (3) the frequency with which the supplier works out arrangements with overdue accounts. *Id*. Therefore, as with the other two elements of the ordinary course of business exception, this court concludes that,

14

as a matter of law, Xyplex failed to prove that ASA paid Xyplex according to the ordinary business terms when ASA delayed payment by between four and ten months.

Accordingly, payments made on September 14, 1994, and November 11, 1994, in the total amount of $36,645.76, are preferences and may be avoided by the debtor-in-possession, and the judgment of the United States Bankruptcy Court, in this respect, is due to be affirmed.

### B.   Cross-Appeal by ASA.

Cross-appellant ASA challenges the bankruptcy court decision that the payment it made to Xyplex on November 18, 1994, to the extent of $98,224.30, qualifies as an exception to the rule of preference and that avoidance of that payment is not available to the debtor-in-possession. *Brief of Appellee/Cross-Appellant* at 1. Specifically, ASA contends on appeal that the bankruptcy court incorrectly held that this payment qualifies for the "contemporaneous exchange" exception of § 547(c)(1).[10] *Id.*

The contemporaneous exchange exception prevents avoidance of transfers during the preference period as follows:

to the extent that such transfer was—

---

[10]In the adversarial proceeding before the bankruptcy court in this case, Xyplex contended that, if this transfer is preferential, it is protected by the "ordinary course of business exception" found in 11 U.S.C. § 547(c)(2). *Anderson-Smith & Assoc., Inc. v. Xyplex, Inc. (In the Matter of Anderson Smith & Assoc., Inc.)*, 188 B.R. 679, 687 (Bankr. N.D. Ala. 1995). However, the bankruptcy court disagreed because "Xyplex required Anderson to personally guarantee said debt or in the alternative required Debtor to provide an assignment of proceeds before shipping [the goods]." *Id.* Instead, the bankruptcy court accepted Xyplex's alternative argument that the "contemporaneous exchange" exception found in 11 U.S.C. § 547(c)(1) applied to this payment. *Id.* Because Xyplex does not challenge that decision on appeal and because this court affirms the decision of the bankruptcy court as to the "contemporaneous exchange" exception, the question of whether Xyplex proved that this payment is protected by the "ordinary course of business" exception is not before this court.

(A)     intended by the debtor and the creditor to or for whose benefit such

transfer was made to be a contemporaneous exchange for new value

given to the debtor;  and

(B)     in fact a substantially contemporaneous exchange.   11 U.S.C. §

547(c)(1).

This exception does not offend the purpose of preference law, to avoid transfers on the eve

of bankruptcy that deplete the debtors estate, because the debtor exchanges its assets for

"new value," not an old debt, and therefore, such transfers do not deplete the debtor's

estate. See *In re Martin*, 205 B.R. 646 (Bankr. M.D. Ala. 1993), *aff'd*, 184 B.R. 985 (M.D. Ala.

1995), *aff'd, Alfa Mut. Fire Ins. Co. v. Memory*, 101 F.3d 708 (11th Cir. 1996).

Four separate requirements lurk here, however, and in order to save a transfer under

§ 547(c)(1), the recipient must prove each of the following: (1) the debtor received "new

value;" (2) the new value was "in exchange" for the transfer that the debtor seeks to avoid;

(3) the parties "intended" a contemporaneous exchange;" and (4) the exchange of new

value for the transfer was, in fact, "substantially contemporaneous." *Unsecured Creditors*

*Comm. v. Airport Aviation Serv., Inc. (In re Arrow Air, Inc.)*, 940 F.2d 1463 (11th Cir. 1991);

David G. Epstein, et al., Bankruptcy, § 6-23, at 588 (1992). In this case, the bankruptcy court

found, and ASA does not dispute, that Xyplex exchanged "new value," $98,224.30 worth of

goods, for the payment that ASA seeks to avoid.[11] *Anderson-Smith*, 188 B.R. at 688; *Brief*

---

[11] ASA's only arguments on appeal are (1) that "no 'contemporaneous' exchange was even contemplated, much less 'intended' by the parties" and (2) that "not only must the parties have intended a contemporaneous exchange[,] it must in fact been [sic] contemporaneous." *Brief of Appellee/Cross-Appellant* at 6.

*of Appellee/Cross-Appellant* at 6. Upon careful review of the evidence and the relevant law, this court concludes that Xyplex proved the first two elements of the contemporaneous exchange exception as to this payment.

As to the third element, the subjective component, the bankruptcy court held that the parties "intended" a contemporaneous exchange. *Anderson-Smith*, 188 B.R. at 688-89; 11 U.S.C. § 547(c)(1)(A). Being a state of mind, intent is rarely susceptible to direct proof and must ordinarily be inferred from the facts. Therefore, the question of intent ordinarily becomes a fact determination, reviewed under the clearly erroneous standard. *In re Spada*, 903 F.2d 971 (3rd Cir. 1990); *accord Official Unsecured Creditors*, 940 F.2d at 1446 (affirming lower courts finding of the element of intent because "[a]ltough we might not have drawn the same inferences for the given facts, the bankruptcy courts findings have some support in the record; so we cannot call them clearly erroneous.")

The bankruptcy court cited conflicting testimony over whether this transfer was secured by an assignment of the proceeds or by the personal guarantee of Anderson, the president of ASA. *Anderson-Smith*, 188 B.R. at 688. The court declared, "It is unclear whether Xyplex agreed to accept Anderson's personal guarantee for said invoice or whether the parties agreed to assignment of the proceeds." *Id.* The court summarized its determination on the intent element by stating:

> Despite the parties apparent confusion regarding the transaction, it is clear that the parties intended for the transaction to be a contemporaneous exchange. Xyplex delivered the goods represented by invoice 1888 on November 11, 1994 only upon Debtor's assurance of payment, either in the form of a personal guarantee or assignment of proceeds, which had never before been required. *Id.* at 689.

17

Therefore, the bankruptcy court did not determine whether the transaction was secured by a personal guarantee or by an assignment, but rather, the court held that either indicates an intent by the parties that the transaction be a contemporaneous exchange, not a credit transaction.

Upon careful review of the record, this court agrees that the evidence is not determinative of whether Xyplex exchanged goods for an assignment of proceeds from the sale of those goods or whether Xyplex delivered goods to ASA because it received a personal guarantee of payment from Anderson. Nevertheless, based upon the evidence, this court does not find the bankruptcy court's factual determination that the parties intended this exchange to be contemporaneous to be clearly erroneous. Furthermore, this court agrees that the evidence indicates that the parties intended to take this transaction out of the realm of an ordinary credit transaction, that they intended this exchange to be a *quid pro quo* exchange of value, and that they intended it to be contemporaneous. Therefore, Xyplex met its burden of proof on the this element of the "contemporaneous exchange" exception.

As to the fourth element, the objective component, the bankruptcy court held that this payment was, in the words of the statute, "substantially contemporaneous." *Anderson-Smith*, 188 B.R. at 689; 11 U.S.C. § 547(c)(1)(B). The facts in this regard are not in dispute. ASA placed its order on October 31, 1994; Xyplex delivered the goods and issued its invoice for payment on November 9, 1994; and, ASA negotiated the Southern Company draft

to Xyplex in payment of the invoice on November 18, 1994. Therefore, nine days elapsed between delivery of the goods and payment.[12]

ASA vigorously argues that this exchange was not, as a matter of law, "substantially contemporaneous." *Brief of Appellee/Cross-Appellant* at 6. ASA cites *In re Standard Food Services, Inc.*, 723 F.2d 820 (11th Cir. 1984), for support. *Brief of Appellee/Cross-Appellant* at 6-7. However, this case is not instructive on whether the exchange between ASA and Xyplex was, in fact, contemporaneous within the meaning of the statute. The court in *Standard Food* held that the challenged exchange, goods for money, became a credit transaction when the buyer's bank dishonored its check, which the buyer tendered as payment at the time of purchase. *Id.* at 821. The court in *Standard Food* acknowledged that if the check had cleared, the exchange would qualify as a contemporaneous exchange, but that dicta is the only thing in *Standard Food* relevant to the issue before this court. *Id.*

On the other hand, courts have directly addressed the issue of what qualifies as an exchange that is contemporaneous in fact. *See e.g. In re Bullion Reserve of N. Am.*, 836 F.2d 1214 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056 (1988) (seventy-seven days not contemporaneous); *In re Hillcrest Foods, Inc.*, 40 B.R. 360 (Bankr. D. Me. 1984) (two and one-half months not contemporaneous). As noted in *In re Brown Family Farms, Inc.*, the courts rarely find that a transfer that spans greater than a month is substantially contemporaneous. 80 B.R. 404 (Bankr. N.D. Ohio 1987). However, a week hiatus is almost presumptively acceptable. *See Dean v. Davis*, 242 U.S. 438 (1917) (under the old

---

[12]Payment, for the purposes of 11 U.S.C. § 547(c)(1) and (2), occurs upon delivery of the check, so long as it is not subsequently dishonored. *In re Standard Food Services, Inc.*, 723 F.2d 820, 821 (11th Cir. 1984).

Bankruptcy Act, a non-purchase-money mortgage executed to secure a loan one week later, and not recorded until eight days later, was "substantially contemporaneous"); Epstein, Bankruptcy § 6-27, p.630.

Furthermore, ASA acknowledges that the term "substantially" in the statute implies that this determination should be flexible, "requiring a case by case examination of all relevant circumstances." *Brief of Appellee/Cross-Appellant* at 5 (quoting W.C. Norton, NORTON BANKRUPTCY LAW AND PRACTICE 2d § 57:13). ASA also acknowledges that "substantially contemporaneous" means the delay was "not excessive" under the circumstances. *Id.* Therefore, in this case, where the parties intended a contemporaneous exchange and where only nine days elapsed between delivery of the goods and payment, this court concludes that this exchange was, as a matter of law, "substantially contemporaneous."

Accordingly, Xyplex met its burden of proof on all aspects of § 547(c)(1) with respect to the payment made by check #4, on November 18, 1994; and, to the extent of $98,224.30, this payment is exempted from avoidance by the debtor-in-possession. Therefore, the judgment of the bankruptcy court, in this respect, is due to be affirmed.

## IV.    Conclusion.

The decision of the United States Bankruptcy Court, by separate order, will be affirmed. Costs will be taxed against the appellant and in favor of the appellee.

Done, this ____4th____ of December, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

21